**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| JAMES RYALS, Jr. et al., ) | |
| ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 3:09cv625 |
| ) | |
| HIRERIGHT SOLUTIONS, INC., et al., ) | |
| ) | |
| Defendants. ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF**
**THEIR MOTION FOR FINAL APPROVAL OF CLASS SETTLEMENT,**
**AND AN AWARD OF INCENTIVE PAYMENT, ATTORNEYS FEES**

Plaintiffs, on behalf of themselves and the Class, respectfully submit this

memorandum in support of final approval of the class settlement reached in this case.

Class counsel herein also petition the Court for an award of attorneys' fees and for the

reimbursement of their out-of-pocket expenses incurred in furtherance of litigating this

matter to the successful result now before this Court for final approval.

**I.      OVERVIEW**

This class settlement is made on behalf of consumers who were the subject of an

employment-purpose consumer report generated and furnished to a third party by

Defendants.  After contentious litigation in multiple states amongst teams of attorneys,

Class Counsel asks the Court to approve a $29 million cash settlement – the third largest

Fair Credit Reporting Act (FCRA) class action settlement in the statute's history.[1]

---

[1] The *Ryals* class size is less than 700,000 consumers.  The larger settlements (*White, et al. v. Experian, et al*,  $45 million, www.bankruptcydischargesettlement.com, and *In Re*

While filed in 2009 and 2010, respectively, the *Ryals*, *Smith* and *Henderson* cases were the culmination of additional years of work before the filing of any Complaint and on-docket litigation.  (Decl. of Leonard A. Bennett, Exhibit "A")  The three actions have been consolidated[2] after having been litigated in three states on the Plaintiffs' side by 6 private law firms as well as Philadelphia's Community Legal Services ("CLS"), which included at least 18 attorneys. While the litigation was intense, the mediation was in many ways even more difficult and rigorous.  The settlement process was overseen by Magistrate Judge Dohnal and run by an accomplished private mediator, Professor Eric D. Green.[3]  It took close to eight months to get a deal in place.  Defendants were represented by national powerhouse WILLIAMS AND CONNOLLY and employment law specialists at LITTLER – with multiple partners and no less than five attorneys active and present during the mediation process.  In addition, there were multiple layers of insurance coverage in dispute with carrier counsel heavily involved in settlement and involved and/or present at the multiple mediations.[4]

---

*Trans Union Privacy*, a conditional $75 million, www.listclassaction.com) involved class sizes of 150 million and 8 million respectively.

[2] This settlement resolves three cases that have been consolidated by the court herein (Docket No. 76), *Ryals v. HireRight Sols., Inc.* No. 3:09CV625 (E.D.Va.)(*Ryals* Action); *Smith, et al., v. HireRight Sols., Inc.*, originally filed and docketed as No. 2:09CV06007-RB (E.D.Pa.), transferred and docketed as No. 10cv443 (N.D. Okla.)(*Smith* Action); and *Henderson, et al., v. HireRight Sols., Inc.*, originally filed and docketed as No. 2:10CV459-RB (E.D. Pa.), transferred and docketed as No. 10cv444 (N.D.Okla.)

[3] http://www.resolutionsllc.com/principals.htm last visited on October 18, 2011.

[4] It was also a challenge to create a process to join the disparate litigation teams vying to act as class counsel without creating "reverse auction" leverages against the class.  That such a class counsel structure became possible and was successful is a credit to the "put the clients first" perspectives shared between all Plaintiffs' groups." See generally, Barbara J. Rothstein & Thomas E. Willging, *Managing Class Action Litigation: A Pocket Guide for Judges* (2005).

The three cases were litigated in two groups, *Ryals* and *Smith/Henderson*. Collectively, they alleged multiple and largely overlapping FCRA claims focused on both accuracy and related investigation and notices rights protected or required under the statute.  Plaintiffs allege that in the course of creating and furnishing these background checks to make employment decisions, the Defendants, operating as a single "consumer reporting agency" violated the Fair Credit Reporting Act (FCRA) by failing to:  (1) provide the Plaintiffs and other similarly situated consumers notice at such times that Defendants furnished employment-related consumer reports to prospective employers; and (2) maintain proper procedures for resolving disputes by Plaintiffs and other similarly situated consumers regarding the contents of their consumer reports.  The Plaintiffs alleged that the Defendants violated several sections of the FCRA, principally 15 U.S.C. §§ 1681k(a)(1), 1681i(a), and 1681e(b).

The *Ryals* team began pre-filing work in 2008, with Ryals' Ohio counsel and Virginia counsel then unconnected.   After joining, these firms filed the *Ryals* complaint on October 5, 2009. (Docket No. 1).  Soon after the *Ryals* Complaint was filed, several Defendants moved to dismiss (Docket No. 16), for Summary Judgment (Docket No. 19) and to transfer (Docket No. 20), while HireRight filed its Answer (Docket No. 18). Briefing was extensive and complete, but Judge Williams neither set the motions for hearing nor rendered a dispositive ruling.  Both sides served and accomplished discovery. Documents were exchanged, including a series of depositions of Defendants' employees obtained in earlier litigation.  For example, in multiple waves, the Parties reviewed and exchanged tens of thousands of pages documents and depositions.  The various discovery exchanged included, for example, details of the Defendants' reporting, notice and

investigation processes as they evolved over a period of years and records to determine

and prove the asserted timing of Defendants' notice compliance.  Thereafter, as the

discovery period was within several weeks of closure (with depositions set for several

weeks running at locations around the country), the parties approached Hon. Dennis W.

Dohnal, U.S. Magistrate Judge regarding an interest in exploring mediation.  The

Magistrate Judge approved a proposed Motion and Order to stay the litigation and permit

his supervision of the settlement process, approval thereafter affirmed by Judge Williams.

(Docket Nos. 51, 53, 54 & 58).

On a separate and independent track, the *Smith* and *Henderson* cases were filed in

the Eastern District of Pennsylvania on December 17, 2009, and February 1, 2010,

respectively.   They differed in the particular reporting inaccuracy that was suffered by

each particular named plaintiff.   As in Virginia, Defendants challenged the validity of

Plaintiffs' allegations as a matter of law.  (*Henderson*, 2:09CV06007, Docket No. 10;

*Smith*, 2:10CV459, Docket No. 7).   In Pennsylvania, the district court denied

Defendant's motion to dismiss. *Smith v. HireRight Solutions, Inc*., 711 F. Supp. 2d 426,

439 (E.D. Pa. 2010)(holding that the "Plaintiff has set forth a viable claim for both willful

violation of section 1681e(b) and willful violation of section 1681k.").  However, as in

*Ryals*, Defendants moved to transfer the case to the District of Oklahoma, where much of

their operation was conducted.  That motion was granted as to both *Smith* (Docket Nos.

28& 29) and *Henderson* (Docket No. 27).  Without adding conjecture as to how such a

matter may have turned out after transfer, it is at least worth noting that in *Smith* and

*Henderson*, Defendants were successful in moving the cases from a venue that had

otherwise denied their Motion to Dismiss and into a venue that was of their own

4

choosing.  In both *Ryals* and *Henderson*, the Plaintiffs filed Amended Class Complaints; engaged in substantial briefing, including in opposition to dispositive motions and motions to transfer; reviewed tens of thousands of pages of documents supplied by Defendants; retained and consulted numerous experts in the field of consumer employment reporting; interviewed numerous consumers; reviewed large numbers of consumer employment reports; created and reviewed analyses of documents provided by Defendants; disclosed deposition transcripts; and reviewed large numbers of documents produced in prior litigation in support of the prosecution of the Actions and settlement negotiations relating thereto.

The *Ryals* team had of course followed *Smith*/*Henderson*, and vice versa.  When *Ryals* was stayed, lead *Ryals* counsel made a concerted and successful effort to forge a co-counsel relationship with *Smith*/*Henderson* counsel, who also included accomplished class action and FCRA litigators.  Such efforts included full-team sessions by phone and in person in Philadelphia.  Prior to the first scheduled in-person mediation, the full team was in place, with an agreed division of roles, responsibilities and labor.   Representatives from both groups then served going forward as co-lead counsel.

Under the supervision of Judge Dohnal, the parties engaged Professor Eric D. Green, one of the most respected mediators in the nation.  The parties met on several occasions, staying overnight in Washington D.C. and engaging in intensive all-day, arms-length negotiations in an attempt to resolve the dispute by settlement.  Insurance counsel participated, as did Defendants' General Counsel.

Settlement of the case was complicated in several ways, in particular in categorizing the types of harms that were suffered by distinct groups of plaintiffs under

specific sections of the FCRA.  The Defendants denied all of Plaintiffs' claims, any wrongdoing and any liability to any putative class member. Ultimately, a complex, but fair settlement structure was negotiated and put to paper by agreement filed on July 1, 2011.  (Settlement Agreement, Docket No. 62-1).

Additional terms – claims process, notice, costs and attorneys fees – then also had to be negotiated and agreed. Over the course of many months following the last settlement conference, the parties endeavored to memorialize the terms of the settlement into a Settlement Agreement.   As explained below, this Settlement is an excellent result for the Class. It provides significant monetary payment to each class member without the risks of further and extended litigation. It includes the greatest cash payments to class members amongst any of the large FCRA class outcomes.  And the settlement has engendered no attorney, public interest or government agency (i.e. Attorneys General, Federal Trade Commission) objections.  It has produced a likely 167 opt outs[5], or a likely .03 % opt-out rate.[6]  The rate of objections is even lower, with 32 objections, representing a .0056 % objection rate, most of which misconstrue the narrow case and claims actually settled and released.[7]  Accordingly, the Parties now ask the Court to order final approval of the Settlement and Plaintiff asks the Court to award attorneys' fees and costs to class counsel.

---

[5] Only 167 of the 422 opt-out forms received by the Administrator were valid (i.e. requested to be excluded from the settlement).  (Aff. of Frank Barkan, RSM McGladrey, Inc. ¶ 15, Exhibit "B").

[6] In calculating the opt out rate, Class Counsel assumed that 84% of class members had been successfully found and reached by mail.  The rate of opt outs to the entire class size is actually just .024%.

[7] Class Counsel is also in contact with several class members who objected because – essentially – they believed they were misclassified out of the 1681i class.  It is expected that when this is corrected the number of objections will drop.

## II.     THE SETTLEMENT, NOTICE AND CLAIMS PROCESS

## A.     Settlement Terms

The settled claims fall into two broad categories:  the § 1681i claim and the §

1681k claim.  Under § 1681i, when "the consumer notifies the [CRA] directly" of a

dispute the consumer has with information in the CRA's file, the CRA must conduct a

reinvestigation into the disputed information and take some action, such as changing the

record, within thirty days of the consumer's contact with the CRA.  15 U.S.C. §

1681i(a)(1)(A).  Section 1681i(a)(2) requires the CRA to "promptly" change the

information if it is indeed inaccurate.  15 U.S.C. § 1681i(a)(2) & (a)(5). These obligations

arise only when the consumer disputes the information in the consumer file; the CRA

need take no action if someone other than the consumer informs it that the information is

inaccurate.  *See* 16 C.F.R. part 600, app. § 614(8).    The allegations in the Amended

Complaint are that HireRight refused to perform a required reinvestigation of the file

unless the consumer complied with HireRight identification and dispute procedures not

expressly imposed by the FCRA.  *See generally* 15 U.S.C. § 1681i. HireRight maintains

that it is in compliance with the FCRA.  The Plaintiffs challenged whether it is in

compliance with the FCRA to delay or deny a reinvestigation of disputed information by

requiring the threshold completion of a form or production of additional identification.

Section 1681k governs the use of public-record information for employment purposes.

When a CRA reports public information that is "likely to have an adverse effect upon a

consumer's ability to obtain employment," the CRA must notify the consumer it is

reporting such information identifying the entity to which the information is being

provided.  15 U.S.C. § 1681k(a)(1).  The notice to the consumer must be given "at the

time" the CRA initially reports the information to its client (usually a prospective employer).  Id.  The FTC has concluded that CRAs may send consumers this notice by first class mail.  16 C.F.R. part 600, app. § 614(8).  Defendants contended that they timely mailed the notices for a period after mid-2009 and that the varied delays for mailings before that period would have made class certification impossible.[8]

The Settlement identified two settlement classes.   The Section 1681k class was defined:

> "1681k Settlement Class" means all consumers for whom HireRight issued a consumer report for employment purposes requiring notice under § 1681k(a)(1) on or after October 5, 2004, but on or before October 15, 2010.

This class consisted of approximately 663,025 class members and included three temporally distinct subclasses.  (Aff. of Frank Barkan, RMS McGladrey, Inc., ¶ 2, Exhibit "B"). The "1681k – Five-Year Subclass" included all consumers for whom HireRight Solutions issued a consumer report for employment purposes requiring notice under § 1681k(a)(1) on or after October 5, 2004, but before December 17, 2007.  The "1681k – Legacy Procedures Subclass" included all consumers for whom HireRight Solutions issued a consumer report for employment purposes requiring notice under § 1681k(a)(1) on or after December 17, 2007 but before June 25, 2008.   And the "1681k – New Procedures Subclass" was limited to all consumers for whom HireRight Solutions issued a consumer report for employment purposes requiring notice under § 1681K(a)(1) on or after June 25, 2008, but on or before October 15, 2010.

---

[8] To counter this, Plaintiffs' counsel sought and obtained the HireRight records of creation, printing and mailing letters in the form of a large volume of individual pages, reports and documents.  They hired a secure out of state vendor to scan and clean the thousands of individual pages and hundreds of thousands of records and make the necessary date delay estimates and calculations.

In the Section 1681k settlement, class members do not release all of their claims. In fact, they release only those under this specific FCRA section, 15 U.S.C. §1681k.  So, for example, if a Section 1681k class member also has an individual inaccuracy claim under § 1681e(b), they are not otherwise restricted by the Settlement from prosecution of and recovery upon such claim.   As discussed below, this limited release moots most of the objections asserted by class members.

The Section 1681i class is much more limited, with approximately 21,347 class members, each of whom it is believed previously contacted Defendants to make a dispute.  (Barkan Aff. ¶ 4).  Although the release negotiated for this class is broader than that for the Section 1681k class, it is still not a general release.  Only FCRA claims (and related state claims) are released.  However, as detailed below, these class members are also paid a larger premium and settlement amount for such release.

The total settlement fund is $ 28,375,000.00, which is a substantial monetary recovery for the settlement class.  If approved herein, class members will receive a gross settlement amount exclusive of attorneys' fees and costs.  The settlement is structured so that all claimants, except those claiming Actual Damages, will receive a check without having to submit any claim form.  Section 1681k class members will at a minimum receive a net payment between $10.00 and $55.00.  The smaller payments are made to class members whose claims had very likely expired under the FCRA's period for the limitation of actions. 15 U.S.C. §1681p.

In addition, each member of the Section 1681i class will receive no less than a net cash payment of $134.  If they file a validated claim of actual damages, they are also entitled to an actual damages payment.   As detailed below, under the present response

9

and claims rates, the expected net payment to each of the 2,799 Section 1681i class

members who submitted an actual claim will exceed $2,100.00.[9]  The notice and claims

program yielded a claims rate of 16.34 %, a hugely and unheard of success.

The Parties also negotiated a result that requires HireRight to change its

procedures and practices in order to ensure accuracy in consumer reports requested by

HireRight customers for the purpose of making employment decisions.  Despite this

substantial benefit to the class, Plaintiffs' counsel is not requesting any fee associated

with this additional, non-monetary relief.

**B.       The Notice Process is Complete.**

In accordance with the Court's Preliminary Approval Order, Class Counsel

retained a national class administration company to accomplish the notice and claims

process for the settlement.  All actions taken by the administrator to date have been under

the direct supervision of Class Counsel with scores of communications, decisions and

consultations required between the administrator and class counsel through the notice

process.  In addition, the Class Counsel and Defendants' counsel have consulted and

worked together throughout the notice and claims process to reach consensus on its day-

to-day implementation.

Of the 21,347 Section 1681i class members that received class notice via first

class mail, the Class Administrator was able to attain a successful delivery rate of 84% of

class notices, thus reaching 84% of the class members. (Barkan Aff. ¶ 10). The claims

---

[9] The Actual Damages Claim fund will be approximately $1.9 million dollars to start.
The parties negotiated a process by which any uncashed checks to the settlement class
will be re-deposited into the Actual Damages Claim fund instead of to a *cy pres* recipient
or reverter to the Defendants.

administrator will use the class member names and addresses to mail out a benefit check if the Settlement is approved by the court. *Id.*

The class notice process itself was negotiated and ultimately implemented. This process was certainly best available given the factors of this case. While it is almost always difficult to obtain current addresses and identification information on class members, especially when a consumer may be facing difficulty finding employment, the Parties and Administrator were able to minimize this problem in this case. Ultimately, the class administrator used a systematic approach to identify, confirm and correct class member addresses using the list it obtained from HireRight as well as database services NCOA and Accurint. (Barkan Aff. ¶¶ 9 & 10). Of the original mailing, only 3,495 of the 21,347 Section 1681i class notices were returned as undeliverable. *Id.*

## C.  Settlement Results[10]

The minimum net payment to Section 1681k class members after fees and all other costs will be $10.00, $55.00 or $16.00. These payments are made to consumers who give up few of their rights, release only the narrowest of claims and who have not otherwise attempted any litigation of their own, though the period of limitations for most claims would have long ago expired.

The net payment to Section 1681i class members who do not assert and submit an actual damages claim will be $134.00 each. (Settlement Agreement § 8.6.1). Again, the statute of limitations period for most of these claims would have otherwise expired. And

---

[10] Plaintiffs' have moved the Court for entry of an attorneys fee and for costs within the customary range of common fund contingency fees. The Court of course must first approve any fee award and Class Counsel does not disrespectfully presume anything in the calculations that follow. However, Class Counsel's estimate of class recoveries will conservatively assume the fee award is granted as moved.

this group of class members is limited to those who have taken no action to assert a claim for payment of actual damages.

The remaining 1681i class members – those who do assert a claim – will certainly receive a net cash payment in excess of $2,100.00. In Plaintiffs' Memorandum supporting the Motion for Preliminary Approval (Docket No. 63), it was necessary to estimate several values – claims rate, mail returns and administration and notice costs – to determine an expected rate of net payments to Section 1681i class members submitting actual damage claims. While at least one necessary input value remains undetermined (i.e. the percentage of successfully mailed non-claim checks that will be uncashed), the expected amount of the claims fund and the likely net payment to each actual damages class member is now somewhat clearer.

The settlement creates a minimum claims fund of $ 1.9 million. (Settlement Agreement § 8.7.1). In addition, added to this amount will be money otherwise allocated for class members who could not be found by mail and then class members who do not then cash their checks. (Settlement Agreement §§ 8.8 – 8.9.2). The simplest way to analyze the expected claim payment numbers is as broken down on Class Counsels' attached worksheet. (*Ryals* Claims Estimate Worksheet, Exhibit "C").

It appears that despite substantial and best reasonable efforts by the Parties to locate each class member, the "class member not found" percentage will be approximately This percentage is a huge success.[11] (Barkan Aff. ¶ 10). If that percentage

---

[11] " '[C]laims made' settlements regularly yield response rates of 10 percent or less." *Sylvester v. CIGNA Corp.,* 369 F.Supp.2d 34, 52 (D.Me.2005) (criticizing a settlement that was only a claims fund, 80% of the class would receive nothing, a 36% attorneys fee was calculated on a theoretical 100% claims assumption, though unclaimed money on fixed claim amounts was to revert to the Defendant.)

holds as to delivered and cashed checks, the 1681i actual claim fund will exceed $ 5.6 million.

Exactly 2,979 persons have submitted actual damage claims.  It is the intention of the settlement agreement, as understood by all Parties, that the threshold for making a claim be as modest and uncomplicated as is reasonable.  However, it is certain that a number of claims forms will not be valid.  For example, some forms are submitted by persons who are not Section 1681i class members (and of course who do not then release or receive payment for such claims).   Still, assuming (a.) 90% of these claims are validated by the Administrator, leaving 2,681; (b.) the undeliverable mail percentage for the 1681k distribution matches that of the 1681i mailing – 16%, and (c.) 90% of the 1681k and non-claimant 1681i class members cash their checks, then the net payment to each actual damages claimant will be at least $ 2,100.00.  (*Ryals* Claims Estimate Worksheet, Exhibit "C").

## D.      Class Member Reaction

Unquestionably, the settlement is an excellent result for the class. Indeed, the relatively low number of objections (32 *pro se* objections) and opt outs (167 to 422[12]) speaks volumes.  Whether the Court considers the hundreds of thousands of class members who neither objected nor opted out, the 9,000 plus or affirmatively telephoned the Administrator for information about the settlement, or the nearly 3,000 who completed a claim form and affirmatively evidenced their choice, the voice of class members is overwhelmingly positive.   By any account, this settlement is a resounding

---

.
[12] Of the opt-out requests, the Administrator noted that 255 requests were from persons "whose names were not found on the original mailing lists or they were facially deficient."  (Barkan Aff. ¶ 13).

success for the class members.  In fact, if the Court considers the 2,799 class members who completed and provided a claim for actual damages, the percentage of objections is still less than 1% of the claims made.

The raw numbers of objections and opt out/exclusion requests are minimal. Given the size of the classes, Class Counsel expected a much larger number of "class action attorneys are greedy" or "HireRight should be put out of business" objections than were made.  And certainly it is unusual that even professional objectors or "greenmailers"[13] could not find a basis to challenge the settlement.   Nevertheless, the Court should consider the substance of each objection.

Class Counsel has summarized the filed objections for organized consideration. (Summary of Objections, Exhibit "D").  Twenty-five (25) are Section 1681k class members, all but several of which object because the settlement does not pay sufficiently to compensate them for their actual damages arising from the issuance of the HireRight report.  These objections – some of which are based on an explanation of inaccuracy, while an approximately equal number, acknowledging the likely accuracy of the report, argue that HireRight should not be permitted to have furnished a report in the first place. Neither basis for the objections is on target.  The 1681k settlement does not affect any individual claims beyond those settled: 15 U.S.C. §1681k.  If the class member has an

_____

[13] '[P]rofessional objectors' almost invariably groundless objections delay the provision of relief to class members who, in most instances, have already waited years for resolution. Second, by feeding off the fees earned by class counsel who took the risk of suing defendants on a purely contingent basis, as is the normal practice in class actions, professional objectors create a disincentive for class counsel to take on such risky matters. That disincentive clashes with the public interest, repeatedly recognized by courts, to incentivize class counsel to handle such cases."

Bruce D. Greenberg, *Keeping the Flies Out of the Ointment: Restricting Objectors to Class Action Settlements*, 84 St. John's L. Rev. 949, 951 (2010).

actual damage claim under the FCRA or any other statute, they retain such claim despite the settlement.  And the set of consumers who are in the 1681k class, and not in the 1681i class, are those who have not previously contacted HireRight to put it on notice of a dispute.  Further, there is no attorney team in the history of class litigation with as much experience litigating FCRA claims or with as much experience trying FCRA cases to a jury as that assembled as Class Counsel.  There are certainly no friends of CRAs on the Plaintiffs' side of the litigation.  Yet even with that skill set and bias, it is an impossible and untoward argument to make that consumer reporting agencies should not even exist.

The seven (7) 1681i objections are all based on the objector's belief that the settlement is inadequate.  Of these, several do not assert that any particular information is inaccurate, two are primarily targeted at the conduct of a previous employer and one does not state any specific objection.

Certainly Class Counsel would much prefer to force a $ 60 million settlement instead of a $ 29 million deal, an impossibility in this already record-breaking result.  Or even $ 129 million.  Yet even in these impossible ranges, the expectations of the "not enough money" objections would be unmet.  And of course if any class member does have a valid claim with evidence sufficient to establish causation, for actual damages, still within the statute of limitations and they are able to obtain counsel willing to litigate such a case in federal court, the proper procedure is to request exclusion and opt out of the settlement.  *Gunnells v. Healthplan Services, Inc.,* 348 F.3d 417, 430 (4th Cir. 2003)(" Rule 23(c)(2) permits members of a class maintained under section (b)(3) to opt out of the class, providing an option for those Plaintiffs who wish to pursue claims against TPCM requiring more individualized inquiry. Thus, rhetoric aside, Plaintiffs with

15

only direct claims are not being "[j]amm[ed]," "sacrificed" or "caught" in any class action against their will. (citation omitted).")

The objections are properly discounted for another important reason – because nearly 3,000 claimants have expressly and hundreds of thousands of class members implicitly voted otherwise.   To accept objections from a handful of consumers who assert that they would not receive enough money means to abandon the 3,000 claims from consumers who instead chose to obtain $2,100.00 and obtain it now.

## III.   ARGUMENT

### A.   The Proposed Settlement is Fair, Reasonable, and Adequate and Should Be Approved.

#### 1.   The Standard for Judicial Approval of Class Action Settlements

There is a strong judicial policy within this Circuit favoring resolution of litigation prior to trial. *See e.g., S.C. Nat'l Bank v. Stone,* 749 F. Supp. 1419, 1423 (D.S.C. 1990) ("[t]he voluntary resolution of litigation through settlement is strongly favored by the courts") (citing *Williams v. First Nat'l Bank,* 216 U.S. 582 (1910)). Settlement spares the litigants the uncertainty, delay and expense of a trial and appeals while simultaneously reducing the burden on judicial resources. As the court in *S.C. Nat'l Bank* observed:

> In the class action context in particular, there is an overriding public interest in favor of settlement. Settlement of the complex disputes often involved in class actions minimizes the litigation expenses of both parties and also reduces the strains such litigation imposes upon already scarce judicial resources.

749 F. Supp. At 1423 (quoting *Armstrong v. Bd. of Sch. Dirs.,* 616 F.2d 305, 313 (7th Cir. 1980)).

In order to safeguard the interests of the absent class members, all class settlements and the corresponding later dismissal of the case, requires Court approval. Fed. R. Civ. P. 23(e)(1)(A). The process for that approval is governed by Rule 23(e), which provides, in relevant part:

> (e) Settlement, Voluntary Dismissal, or Compromise.
>
> (1)(A) The court must approve any settlement, voluntary dismissal, or compromise of the claims, issues, or defenses of a certified class.
>
> (B) The court must direct notice in a reasonable manner to all class members who would be bound by a proposed settlement, voluntary dismissal, or compromise.
>
> (C) The court may approve a settlement, voluntary dismissal, or compromise that would bind class members only after a hearing and on finding that the settlement, voluntary dismissal, or compromise is fair, reasonable, and adequate.
>
> (2) The parties seeking approval of a settlement, voluntary dismissal, or compromise under Rule 23(e)(1) must file a statement identifying and agreement made in connection with the proposed settlement, voluntary dismissal, or compromise.

Rule 23(e) thus imposes two basic requirements on the parties and on the Court before the approval of a class settlement and dismissal. First, the Court must determine that notice was directed "in a reasonable manner to all class members." Fed R. Civ. P. 23(e)(1)(B). Second, the Court must determine that the settlement "is fair, reasonable, and adequate." The parties address each of these requirements.

Federal jurisprudence strongly favors resolution of class actions through settlement. *San Francisco NAACP v. San Francisco Unified Sch. Dist.,* 59 F. Supp. 2d 1021, 1029 (N.D. Cal. 1999); *see* Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 11.41 (4th ed. 2002) ("The compromise of complex litigation is encouraged by the courts and favored by public policy."). Rule 23 requires Court review of the resolution of a class action such as this one. Specifically, the Rule provides that "[t]he

claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval." Fed. R. Civ. P. 23(e). Court approval is required to ensure that the parties gave adequate consideration to the rights of absent class members during settlement negotiations. *Henley v. FMC Corp.,* 207 F. Supp. 2d 489, 492 (S.D. W. Va. 2002) (*citing In re Jiffy Lube Sec. Litig.,* 927 F.2d 155, 158 (4th Cir. 1991)). The Court may approve a settlement only after a hearing and on finding that it is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). Approval of a class action settlement is committed to the "sound discretion of the district courts to appraise the reasonableness of particular class-action settlements on a case-by-case basis, in light of the relevant circumstances." *In re MicroStrategy, Inc. Sec. Litig.,* 148 F. Supp. 2d 654, 663 (E.D. Va. 2001). Additionally, "there is a strong initial presumption that the compromise is fair and reasonable." *Id. (quoting S. Carolina Nat'l Bank v. Stone*, 139 F.R.D. at 339).

In determining whether a given settlement is reasonable, the court should avoid transforming the hearing on the settlement into a trial on the merits regarding the strengths and weaknesses of each side of the case. *Flinn v. F.M.C. Corp*, 528 F.2d 1169, 1172-73 (4th Cir. 1975). Ultimately, the approval of a proposed settlement agreement is in the sound discretion of the Court. *Strang v. JHM Mortgage Sec. Ltd. P'ship*, 890 F. Supp. 499, 501 (E.D. Va. 1995)(citing *Jiffy Lube*, 927 F.2d at 158).

### 2.   The Notice to the Class Members was Reasonable.

In a settlement class maintained under Rule 23(b)(3), the class notice must meet the requirements of both Federal Rules of Civil Procedure 23(c)(2) and 23(e). Rule 23(e) specifies that "[n]o class action may be "dismissed or compromised without [court]

18

approval,' preceded by notice to class members." Fed. R. Civ. P. 23(e). Rule 23(c)(2) requires that notice to the class must be "the best practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c). The Rule also requires that the notice inform potential class members that (1) they have an opportunity to opt out; (2) the judgment will bind all class members who do not opt out; (3) and any member who does not opt out may appear through counsel. *Id.* The Court must consider the mode of dissemination and the content of the notice to assess whether such notice was sufficient. *See* Federal Judicial Center, *Manual for Complex Litigation* § 21.312 (4th 2004).

The class list was compiled by the Administrator based on two lists it received from HireRight.  First, the Section 1681k Class list originally contained 665,318 names and addresses of individuals who were the subject of a HireRight background check that contained negative public record information.  (Barken Aff. ¶ 2).  Of those names and addresses, there were 1,032 records without an address and 1,261 that were duplicates. The Administrator mailed notices to the remaining 663,025 class members via fourth class postage as required by the Settlement Agreement.  Second, the Section 1681i class list was provided to the Administrator with 21,763 records.  Of those, the administrator determined 416 had no address, thus it mailed notices to the remaining 21,347 class members.  (Barken Aff. ¶ 4).  The Administrator then undertook to identify addresses for 1,448 class members that appeared on the original lists, but for whom no address was provided, by accessing NCOA or Accurint.[14]  Through this address search, the Administrator was able to identify addresses and mail 627 notice packets to these class

---

[14] The parties sought and received court approval for this method of determining class member addresses.  (Docket Nos. 69 & 70, 71).

members. .  (Barken Aff. ¶ 7-8).   Out of all the records received by the Administrator,

573 were not mailed for wont of an address.  Id.

The efforts used to identify class member addresses is absolutely as thorough as

could have been accomplished.  With 665,318 members, it was a large class, but it was

also susceptible of accurate identification because each class member is a consumer about

whom HireRight generated a consumer report, including last known addresses. Although

the Section 1681k notices were sent fourth class, and thus not returnable, out of all

21,347 of the Section 1681i class notices sent, only 3,495 notices were undeliverable. .

(Barken Aff. ¶ 8, 10).  With over a 84% delivery rate, it appears that there is truly no

better alternative that could have been attempted.

As this Court has held, "[w]hat amounts to reasonable efforts under the

circumstances is for the Court to determine after examining the available information and

possible identification methods . . . 'In every case, reasonableness is a function of [the]

anticipated results, costs, and amount involved.'" *Fisher v. Va. Elec. & Power Co.,* 217

F.R.D. 201, 227 (E.D. Va. 2003) (citations omitted). The Supreme Court has concluded

that direct notice satisfies due process, *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797,

812-13 (1985), and other courts – including this court and others within the Fourth

Circuit – have approved mailed-notice programs that reached a much smaller percentage

of class members than the class notice reached in this case. *See In re Serzone*, 231 F.R.D.

221, 236 (S.D. W. Va. 2005) (approving notice program where direct mail portion was

estimated to have reached 80% of class members); *Martin v. United Auto Credit Corp.*,

3:05cv00143 (E.D. Va. Aug. 29, 2006) (Final Order approving class notice with

approximately 85% delivery).

HireRight also served notice of this settlement on the relevant state and federal authorities as required by the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1715. As reflected from the absence of any appearance under CAFA on the Court's docket, none of these agencies or states have objected to the Settlement.

The Parties' efforts to provide class members with notice of the settlement makes in clear that such notice was the best available notice under the circumstances given: (a) the available information; (b) the possible identification methods; (c) the number of class members; and (d) the amount of the settlement. The Parties have complied fully with the Court's Preliminary Approval Order, and have taken reasonable steps to ensure that the Class Members were notified – in the best and most direct manner possible – of the Settlement's terms and excellent benefits.

### 3.  An Analysis of the *Jiffy Lube* Factors Demonstrates that the Settlement is Fair and Reasonable.

The next phase of the Court's determination of compliance with Rule 23(e)(1)(c) typically requires a two-part analysis, often referred to as the *Jiffy Lube* factors. The Court must determine whether the settlement is "fair and reasonable" and then whether the settlement is "adequate." The approval of a proposed settlement agreement is in the sound discretion of the Court. *In re Jiffy Lube Sec. Litig.*, 927 F.2d at 158.

The first step in the *Jiffy Lube* analysis is a determination as to the fairness of the settlement. The fairness factors are critical to the protection of the class members from unscrupulous class counsel and relate to whether there has been arm's length bargaining. *See In re Mid-Atlantic Toyota Antitrust Litig.*, 564 F. Supp. 1379, 1383 (D. Md. 1983); *S. Carolina Nat'l Bank v. Stone*, 139 F.R.D. 335, 339 (D.S.C. 1991). The court must consider four factors: (i) the posture of the case at the time of settlement; (ii) the extent of

discovery that has been conducted; (iii) the circumstances surrounding the negotiations; and (iv) the experience of counsel. *In re Jiffy Lube Sec. Litig.*, 927 F.2d at 158-59; *see also In re Microstrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d at 663-64; *Strang v. JHM Mortg. Sec. Ltd. P'ship*, 890 F. Supp. 499, 501 (E.D. Va. 1995). A proposed class action settlement is considered presumptively fair where there is no evidence of collusion and the parties, through capable counsel, have engaged in arm's length negotiations. *See S. Carolina Nat'l Bank*, 139 F.R.D. at 339. As described below, the settlement reached in this case is clearly fair and each of the *Jiffy Lube* factors are satisfied.

The Parties agreed to settle only after conducting sufficient merits-related discovery, both formally and informally. The Parties also conducted extensive and substantive settlement talks, including engaging a private mediator for four all-day sessions. It was not possible to settle the case at an early posture – not only were several in-person mediation sessions required, so too were a great deal of negotiations following discovery cutoff as well as active litigation. The Plaintiffs filed amended complaints in *Ryals* and *Henderson*; sought consolidation of *Ryals, Henderson* and *Smith* for purposes of settlement; the parties engaged in extensive briefing on several dispositive motions; conducted extensive discovery that included review of tens of thousands of pages of documents; retention and consultation with numerous experts; interviews with hundreds of consumers; review of numerous consumer reports; review and disclosure of deposition transcripts taken in previous cases with similar issues; review and disclosure of large numbers of documents produced in prior litigation.

The posture of the case at the time of settlement is a factor that supports approval. *See In re Microstrategy, Inc.*, 148 F. Supp. 2d at 664 (approving of proposed settlement

despite the fact that it was reached "early" in litigation). The allegations in this case were that HireRight failed to conduct a reinvestigation once it received a dispute from the Plaintiffs.   Although HireRight does not acknowledge any wrongdoing, the consumers from whom it received disputes were entitled to a reinvestigation and correction of their consumer reports.  The consumer reports were used for employment decisions.  Had the case not then settled, the Plaintiffs were sufficiently prepared to move for class certification, which the Defendant was prepared to contest.

There are advantages to the parties and to the docket when opposing counsel are already up to speed on the legal and factual issues in a case and in a field of practice. *See S. Carolina Nat'l Bank*, 139 F.R.D. at 339 (concluding fairness met where settlement discussions "were, at times, supervised by a magistrate judge and were hard fought and always adversarial," and those negotiations "were conducted by able counsel" with substantial experience in the area of securities law). Experienced counsel negotiated the Settlement, making it their first priority bringing the best benefit possible to their clients, and in Plaintiffs' cases, to the Class.

Leonard Bennett and Mathew Erausquin have extensive experience in both consumer protection and class action litigation, having been involved in now numerous, large consumer class actions. See e.g. *Soutter v. Equifax Info. Servs., LLC,* 3:10CV107, 2011 WL 1226025 (E.D. Va. Mar. 30, 2011) ("[T]he Court finds that Soutter's counsel is qualified, experienced, and able to conduct this litigation. Counsel is experienced in class action work, as well as consumer protection issues, and has been approved by this Court and others as class counsel in numerous cases.").  See also Decl. of Leonard A. Bennett, Exhibit "A".

Attorneys with Donovan Searles & Axler, LLC have been approved as class counsel in numerous consumer class actions.  *See, e.g., Chakejian v Equifax Information Servs., LLC*, 256 F.R.D. 492 (E.D. Pa. 2009); *Barel v. Bank of America*, 255 F.R.D. 393 (E.D. Pa. 2009);  *Markocki v. Old Republic National Title Ins. Co.,* 254 F.R.D. 242 (E.D. Pa. 2008); *Strausser v. ACB Receivables Management, Inc.*, 2008 WL 859224 (E.D. Pa. Mar. 28, 2008).

Christopher Colt North is an experienced class action attorney who, working with Consumer Litigation Associates, has been found to be adequate class counsel in this court and others.  He has represented consumers in some of the largest class action settlements in Virginia.  *See, e.g. Williams v. Lexis-Nexis Risk Mgt.*, No. 3:06CV241 (E.D.Va. 2008); *Beverly v. Wal-Mart*, No. 3:07Cv469 (E.D.Va. 2007); and *Daily v. NCO,* No. 3:09CV031 (E.D.Va. 2011).

James Francis has been certified as class counsel by numerous courts in 29 cases, including in a similar employment-related consumer reporting case. See e.g. *Serrano v. Sterlin Testing Systems, Inc*, 711 F.Supp.ed 402, 420 (E.D. Pa. 2010)(finding that "counsel's skill and apparent efficiency supports approval" and that counsel had been certified as class counsel in many other consumer class actions "by this Court and others.").  Like Virginia counsel, he focuses his practice solely on the representation of consumers, and in addition to his federal class action experience has successfully litigated several other notable consumer cases, *Cortez v. Trans Union*, LLC, 617 F.3d 688 (3d Cir. 2010); *Little v. Kia Motors America, Inc*., C.P. Phila. County, Jan. Term, 2001, No. 2199 ($5.6 million verdict for class of car purchasers);; *Ziegenfuse v. Apex Asset Mgt. LLC*,

239 F.R.D. 400 (E.D. Pa. 2006); *Stoner v. CBA Info. Servs.*, 352 F.Supp. 2d 549 (E.D. Pa.

2005); *Crane v. Trans Union, LLC*, 282 F.Supp.2d 311 (E.D. Pa. 2003).

The Parties also engaged in discovery sufficient to aid Counsel and the Court in

evaluating Plaintiffs' claims and Defendants' defenses. These facts further point to the

conclusion that the Proposed Settlement was the product of arm's-length negotiation by

experienced counsel and thus warrants preliminary approval. *See In re Jiffy Lube*, 927

F.2d at 159; *see also Strang v. JHM Mortgage Sec. Ltd. P'ship*, 890 F. Supp. 499, 501-02

(E.D. Va. 1995) (concluding fairness requirement met where "plaintiffs' counsel, with

their wealth of experience and knowledge in the securities-class action area, engaged in

sufficiently extended and detailed settlement negotiations to secure a favorable settlement

for the Class").

The Parties fairly reached the Settlement. An arms-length negotiation process as

in the present instance, with the assistance of a United States Magistrate Judge and

supervision by an experienced third-party mediator, which more than satisfies the

requirement that the settlement not be one brokered through "collusion or coercion." *See,*

*e.g., Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 117 (2d Cir. 2005); *Weiss v.*

*Regal Collections*, Civ. No. 01CV881-DMC, 2006 WL 2038493, at *2 (D.N.J. July 19,

2006).

>    **4.      An Analysis of the *Jiffy Lube* Factors Demonstrates that the
>             Settlement is Adequate**

The Court must also determine whether the proposed class settlement is

substantively "adequate", the second prong of the *Jiffy Lube* analysis. The Fourth

Circuit's decision in *Jiffy Lube* teaches that the adequacy inquiry is guided by evaluating:

(1) the relative strength of the plaintiffs' case on the merits, (2) the existence of any

difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial, (3) the anticipated duration and expense of additional litigation, (4) the solvency of the defendants and the likelihood of recovery on a litigated judgment, and (5) the degree of opposition to the settlement. *In re Jiffy Lube,* 927 F.2d at 159. Plaintiff has at all times believed that this case was very strong in several regards, including being able to establish basic FCRA liability and that the named Plaintiffs were typical not only of the Class but also of consumers seeking employment requiring a consumer report. However, the Defendant was prepared at all times to contest the class certification and the adequacy of the notice. Under the FCRA, liability can be established either upon a showing of negligent or willful noncompliance.  15 U.S.C. §§ 1681n & 1681o.  If negligent noncompliance is proven, a consumer may recover actual damages.  In the case of willful noncompliance, a consumer may recover statutory and punitive damages.  As a practical matter, the Plaintiffs would have to proceed as a class either under a theory of negligence and thus prove uniform actual damages, or proceed under a willfulness theory requiring the higher standard of proof in order to recover statutory and punitive damages. Either way, the Plaintiffs would be required to produce adequate evidence for a jury to find HireRight violated the FCRA.  Without the certainty afforded both sides in the approval of the class settlement, all parties would have proceeded with a long, expensive litigation process likely to culminate in a trial on the merits followed, no doubt, by appeal.

Also present in the case was the uncertainty created by the then-unresolved Motion to Transfer Venue.  While the Eastern District of Virginia and the Fourth Circuit developed a great expertise not only in the federal consumer protections statutes, but in

the FCRA in particular, the federal court in Oklahoma and the Tenth Circuit do not have the same body of developed case law and expertise. *Smith* and *Henderson* had already suffered the effects of being transferred from their chosen venue, and a motion to transfer *Ryals* was pending at the time the case settled.

Despite the fact that Plaintiffs' counsel and Defendants counsel was at all times professional, it was nonetheless contentious as each side zealously represented the interests of their clients. HireRight retained WILLIAMS & CONNOLLY, LLP, one of the biggest, most prestigious law firms in the country, and Littler, a firm with significant FCRA employment expertise. WILLIAMS & CONNOLLY assigned three partners to this case, which factor alone could have impacted the outcome of the case.

The determination of when it is appropriate to settle a case is one that is entrusted to experienced class counsel. It is often difficult to transition off of a litigation track that is focused on an upcoming trial and meeting the various burdens of proof to a mindset that considers that every case – no matter how conceivably strong it may seem – will always have an element of risk at its core. Settlement is the only outcome that allows both sides to be assured of a certain ending to the litigation, alleviating both the risk and cost inherent in further litigation to both sides, as well as the additional burden on the Court. This case was no exception, and in fair consideration of the strengths and weaknesses (as well as with significant involvement by the mediator), Plaintiffs' counsel felt that settlement was appropriate at this juncture. The old adage, "a bird in hand is worth two in the bush" applies with particular force in this case. *See Cardiology Assocs., P.C. v. Nat'l Intergroup, Inc.,* No. 85CV4038, 1987 WL 7030, at *2 (S.D.N.Y. Feb. 13, 1987) (concluding that because continued prosecution of the action would have been

expensive and time-consuming, and would have involved substantial risks, "it [was] not unreasonable for the plaintiff class to take a 'bird in the hand'"); *Alvarado Partners, L.P. v. Mehta*, 723 F. Supp. 540, 547 (D. Colo. 1989) (noting that "[i]t has been held prudent to take 'a bird in the hand instead of a prospective flock in the bush'" in weighing the value of an immediate recovery against "the mere possibility of future relief after protracted and expensive litigation") (quoting *West Virginia v. Chas. Pfizer & Co.*, 314 F. Supp. 710, 740 (D.W.V. 1970)); *In re Microstrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d at 667.

Given the risks to both sides, and the possibility that the Plaintiffs may not prevail at trial, the *Jiffy Lube* factors militate in favor of the adequacy of the settlement. Each member of the 1681k Settlement Classes will receive a monetary gross recovery ranging from $15.00 to $82.50. This class is divided into three groups based upon the date that each class member's consumer report was furnished and thus the FCRA violation occurred. Of the three subclasses, the Five-Year Subclass faced the weakest of the § 1681 claims as it would have been much more difficult to certify the class or defeat a statute of limitations defense.[15] The Five-Year Subclass members will each receive a gross recovery of $15.00, and a net check not less than $10.00. But for this litigation, this subclass would recovery nothing at all.

The second group, the Legacy Procedures Subclass, has the strongest FCRA claims and are all within the statute of limitations period. Violations occurred prior to the installation of a new leadership team in 2008. Prior to June 2008, Plaintiff's contend that predecessor management by USIS Commercial Services Inc., operated far worse

---

[15] The limitations period is the lesser of five years from the date of the violation or two years from discovery. 15 U.S.C. § 1681p.

consumer policies. The gross payment to each class member is $82.50, which was specifically negotiated to ensure a minimum net payment of $55.00, if attorneys' fees and costs are approved as requested.

Finally, Plaintiffs also allege that HireRight's policies and procedures after June 2008 still delayed the § 1681k(a)(1) notices in excess of that permitted by the FCRA. Defendants still vigorously oppose this allegation. However, the HireRight procedure delayed sending § 1681k(a)(1) notice for a period of two days longer than permitted by the statute. In *Williams v. LexisNexis Risk Mgt., Inc.,* No. 3:06cv241, 2007 WL 2439436 (E.D.Va. Aug. 23, 2007). Judge Payne certified a contested class that delayed sending the required notice by one day. The consumers in this subclass will receive a gross payment of $24.00, with a net check of $16.00 if the court approves the attorneys fees and costs requested.

Members of the §1681i settlement class who do not submit a claim will receive a gross recovery of approximately $200.00, with a net of $134.00. As discussed above, the members of this class who suffered actual damages were able to become Actual Damages Claimants under the settlement. They were required to submit a simple claim form by mail or internet. As explained above, each valid claim will net no less than $ 2,100.00.

By its terms, the settlement provides substantial monetary consideration to all class members. Additionally – while they do not concede liability – the Defendants have agreed to change their procedures and processes that were at the heart of this case. In this case, class members obtain a uniquely certain benefit from such prospective relief as the nature of these classes – Trucking industry consumers – requires an ongoing and frequent use of HireRight reports. These benefits realized by the class members immediately are

29

significant, particularly given the time value of money. A dollar realized today is worth considerably more than the same dollar finally collected years later, even assuming the success on the merits and on appeal, and the ability to collect any judgment that was rendered. This factor weighs in favor of the adequacy of the settlement.

It is convincing that despite mailing 684,999 total notices (combining both the 1681k and 1681i classes), so few class members have objected or opted out. "Such a lack of opposition to the partial settlement strongly supports a finding of adequacy, for '[t]he attitude of the members of the Class, as expressed directly or by failure to object, after notice to the settlement is a proper consideration for the trial court.' *Flinn v. FMC Corp.*, 528 F.2d 1169, 1173 (4th Cir. 1975)." *In re Microstrategy, Inc. Sec. Litig.*, 148 F. Supp. 2d at 668. As the Court has previously explained, "[b]ecause 'the reaction of the class to the settlement is perhaps the most significant factor to be weighed in considering its adequacy.' The lack here of any objections to the partial settlement and the small number of class members choosing to opt-out of the case strongly compel a finding of adequacy" *Id.* (citing *Sala v. Nat'l R.R. Passenger Corp.*, 721 F. Supp. 80, 83 (E.D. Pa. 1989). "The small number of objections necessarily must be evaluated relative to the size of this Class of over 1.0 million members. In litigation involving a large class it would be "extremely unusual" not to encounter objections. *See In re Anthracite Coal Antitrust *479 Litigation*, 79 F.R.D. 707, 712–13 (M.D.Pa.1978), *aff'd in part,* 612 F.2d 571 and 612 F.2d 576 (3d Cir.1979)." *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 478-79 (S.D.N.Y. 1998). Where "[t]he parties objecting to the settlements are both qualitatively and quantitatively insignificant," their objections may be disregarded. *In re Corrugated Container Antitrust Litig.*, 659 F.2d 1322, 1327 (5th Cir. 1981), *cert. denied sub nom.*

*CFS Continental, Inc. v. Adams Extract Co.*, 456 U.S. 998 (1982).  Courts recognize that

where the class as a whole supports a settlement, it should be approved.[16]  Indeed, even a

small majority of support creates a presumption in favor of approval.  *See Reed v.*

*General Motors Corp.*, 703 F.2d 170, 174 (5th Cir. 1983) (approving class action

settlement where more than 40 percent of class objected or opted out); *Cotton v. Hinton*,

559 F.2d 1326, 1333 (5th Cir. 1977) (nearly 50 percent opted out or objected; settlement

nevertheless approved).

      **B.**     **The Court should Approve the Request for an Award of Incentive
Payment, Attorneys Fees and Reimbursement of Expenses**

        **1.**    **The Court should Award Incentive Payment to the Class
Representative**

The Court should also approve incentive or service awards for the named

Plaintiffs. Plaintiffs request an incentive award of $ 10,000.00 for their service as named

class representatives. The incentive awards are to be deducted from the settlement fund.

In this case, the Plaintiffs took an active role in the case, participated in the crafting of the

facts sections of the pleadings and were answerable to counsel in prosecuting the case.

Such awards have been regularly approved by judges in the Eastern District of Virginia.

*See e.g. Beverly v. Wal-Mart Stores, Inc.*, No. 3:07cv469; *Williams v. Lexis Nexis Risk*

*Management*, No. 3:06cv241; *Cappetta v. GC Servs. LP*, No. 3:08cv288-JRS (E.D. Va.

---

[16] *See, e.g.*, *In re Beef Industry Antitrust Litig.*, 607 F.2d 167, 180 (5th Cir. 1979), *cert. denied sub nom. Iowa Beef Processors, Inc. v. Meat Price Investigators Ass'n*, 452 U.S. 905 (1981); *Laskey v. Int'l Union*, 638 F.2d 954 (6th Cir. 1981) (small number of objectors demonstrates fairness of a settlement); *Shlensky v. Dorsey*, 574 F.2d 131 (3rd Cir. 1978) (same); *Bryan v. Pittsburgh Plate Glass Co. (PPG Indus., Inc.)*, 494 F.2d 799, 803 (3d Cir.) (20 percent opted out or objected; settlement approved), *cert. denied sub nom. Abate v. Pittsburgh Plate Glass Co.*, 419 U.S. 900, (1974); *Grant v. Bethlehem Steel Corp.*, 823 F.2d 20 (2d Cir. 1987) (thirty-six percent; settlement approved); *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 624 (N.D. Cal. 1979) (sixteen percent; settlement approved).

April 27, 2011); *Makson v. Portfolio Recovery Assoc., Inc.*, No. 3:07cv982-HEH (E.D.

Va. Feb. 9, 2009); *Daily v. NCO; Conley v. First Tennessee*. Particularly in light of

historical incentive awards both within and outside this District, the incentive awards

sought are appropriate. *See e.g. Staton v. Boeing Co.*, 327 F.3d 938, 976-77 (9th Cir.

2003); *In re Bancorp Litig.*, 291 F.3d 1035, 1038 (8th Cir. 2002); *Cook v. Niedert*, 142

F.3d 1004, 1016 (7th Cir. 1998). "An empirical study published in 2006 suggests that

incentive awards are granted in only about a quarter of class suits (28%) and that the

average award per class representative is about $16,000, with the median award per class

representative being closer to $4,000." 4 Newberg on Class Actions § 11:38 (4th ed.)

**2.  The Requested Attorneys Fee is Proper as 33 Percent of the All
        Cash Common Fund.**

The Supreme Court has consistently calculated attorneys' fees in common funds

cases on a percentage-of-the-fund basis. *See Sprague v. Ticonic Nat'l Bank*, 307 U.S.

161, 165-67 (1939); *Boeing Co. v. van Gemert*, 444 U.S. 472, 478-79 (1980); *Blum v.

Stenson*, 465 U.S. 886, 900 n. 16 (1984); *see also* Report of the Third Circuit Task Force,

*Court Awarded Attorney Fees*, 108 F.R.D. 237, 242 (Oct. 8, 1985) (noting that fee

awards in common funds cases have historically been computed based on a percentage of

the fund). The Supreme Court has never adopted the lodestar method over the percentage

of recovery method in a common fund case, even when lower federal courts began using

the lodestar approach in the 1970's. *See Shaw v. Toshiba Am. Info. Sys., Inc.* 91 F. Supp.

2d 942, 943 (E.D. Tex. 2000); *see also Manual for Complex Litigation* § 24.121 at 210.,

Since *Blum*, virtually every Circuit Court of Appeals has joined the Supreme

Court in affirmatively endorsing the percentage of recovery method as an appropriate

method for determining an amount of attorneys' fees in common fund cases. *See In re*

*GMC*, 55 F.3d 768, 821-22 (3rd Cir. 1995); *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047-50 (9th Cir. 2002); *In re Thirteen Appeals Arising out of the San Juan DuPont Plaza Hotel Fire Litig.*, 56 F.3d 295 (1st Cir. 1995); *Gottlieb v. Barry*, 43 F.3d 474, 487 (10th Cir. 1994); *Rawlings v. Prudential-Bache Props., Inc.*, 9 F.3d 513, 515-16 (6th Cir. 1993); *Camden I. Condo. Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 774 (11th Cir. 1991); *Swedish Hosp. Corp v. Shalala*, 1 F.3d 1261, 1268-70 (D.C. Cir. 1993); *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 49 (2nd Cir. 2000).

In the Fourth Circuit, attorneys' fees in common fund cases such as this one are almost universally awarded on a percentage-of-the-recovery basis. *Smith v. Krispy Kreme Doughnut Corp.*, No. 1:05cv00187, 2007 WL 119157, at *1 (M.D.N.C. Jan 10, 2007); *see DeLoach v. Philip Morris Cos.*, No. 00-1235, 2003 WL 23094907, at *3 (M.D.N.C. Dec. 19, 2003) (citing, with approval for this same proposition, *In re Compact Disc Minimum Advertised Price Antitrust Litig.*, 216 F.R.D. 197, 215 (D. Me. 2003)); *see also Strang v. JHM Mortg. Sec. Ltd. P'ship*, 890 F. Supp. 499, 502 (E.D. Va. 1995) (explaining "[a]lthough the Fourth Circuit has not yet ruled on this issue, the current trend among the courts of appeal favors the use of a percentage method to calculate an award of attorneys' fees in common fund cases.").

The Fourth Circuit has not established a benchmark for fee awards in common funds cases, but district courts within the Fourth Circuit have noted that most fee awards range from 25 percent to 40 percent of the settlement fund. Percentage-fee awards are exactly what the name suggests – class counsel fees are determined as a percentage of the total settlement fund. This Court has recognized the importance of incentivizing experienced class counsel to take on risky cases. *See, e.g., In re Microstrategy, Inc. Sec.*

*Litig.*, 172 F. Supp. 2d at 788. In fact, a comprehensive study of attorneys fees in class

action cases notes "a remarkable uniformity in awards between roughly 30% to 33% of

the settlement amount." Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in*

*Class Action Settlements: An Empirical Study*, 1 J. of Empirical Legal Studies 27, 31, 33

(2004). This holds true even in instances where the class recovery runs into the hundreds

of millions of dollars. *See e.g., In re Thirteen Appeals Arising Out of San Juan Dupont*

*Plaza Hotel Fire Litig.*, 56 F.3d at 295 (approving award of thirty percent of $220

million); *In re Combustion, Inc.*, 968 F. Supp. 1116, 1136 (W.D. La. 1997) (awarding

thirty-six percent of $125 million). *In re Bancorp Litig.*, 291 F.3d 1035, 1038 (8th Cir.

2002) (approving award of 36% of $3.5 million settlement fund); *Gwozdzinnsky v.*

*Sandler Assoc.*, No. 97-7314, 1998 WL 50368, 159 F.3d 1346 (2d Cir. 1998) (table)

(affirming district court's award of 25% of $1 million common fund) (unpublished); *In re*

*Educ. Testing Serv.*, 447 F. Supp. 2d 612, 631 (E.D. La. 2006)(concluding the customary

fee award for class actions "is between 22% and 27%"); *In re CMS Energy ERISA Litig.*,

No. 02-72834, 2006 WL 2109499, at *1 (E.D. Mich. June 27, 2006) (awarding fee of

28.5% of $28 million settlement fund); *In re Xcel Energy, Inc.*, 364 F. Supp. 2d 980, 995

(D. Minn. 2005) (awarding 25% of $80 million settlement fund); *Strougo ex rel.*

*Brazilian Equity Fund, Inc. v. Bassini*, 258 F. Supp. 2d 254, 262 (S.D.N.Y. 2003)

(granting attorneys fees in amount of 33 1/3% of $1.5 million settlement fund); *Maley v.*

*Del Global Techs. Corp.*, 186 F. Supp. 2d 358, 370 (S.D.N.Y. 2002) (awarding 33.3% of

$3.8 million settlement fund); *Kidrick v. ABC Television & Appliance Rental*, No.

3:97cv69, 1999 WL 1027050, at *1-2 (N.D. W. Va. May 12, 1999) (awarding 30.6% of

approximately $400,000 settlement fund, noting that "[a]n award of fees in the range of

30% of the fund has been held to be reasonable. . . . Fees as high as 50% of the fund have been awarded.") (internal citations omitted).

In this case, the Defendants agreed not to oppose Class Counsel's fee requests in the total percentage of 33 % of the full common fund.   As with any class case that they agree to take on, Plaintiffs' counsel live by the result that they obtain for the class members.  In this case, where they bore the risk of the litigation entirely and advanced significant funds in furtherance of the litigation, Class Counsel submits that fee of one-third of the cash recovered for the class is reasonable.  Such an award is in operation lower than the 33% of the cash recovered because it is not even to a penny calculated against the non-cash value in the case.   It is customary in many and even most class action settlements to assert a monetary value for process changes, consumer report corrections or other equitable changes made as a result of the litigation.  For example, in a 2003 FCRA class settlement, *Clark v. Experian Info. Sols.*, No. 8:00cv1217-22, 2004 WL 256433 (D.S.C. 2004), Class Counsel obtained (over present Class Counsel's objection) a fee award of $15 million with no cash paid to the class and based on a percentage of injunctive relief value.  The benefit to justify such a fee was simply the injunctive relief and remedial changes to the manner in which each national consumer reporting agency would furnish class member credit reports.[17]  While the consideration obtained in the case is certainly substantially greater than the already considerable cash value of the settlement, such value is not inputted into Plaintiffs' cash value measure.

---

[17] Present Class counsel, Mr. Bennett, appeared in the case as lead objectors' counsel. He was successful in forcing some changes to the settlement, but despite objection, he was unable to prevent the payment of such a large fee to the attorneys to the exclusion of the class.

Counsel has consistently taken the position in all cases that the attorneys fee should be based on a percentage of the recovery obtained for the class. This has been true even in cases where the result is an objectively small fee such as in *Mayfield v. Memberstrust Credit Union*, 3:07cv506 (E.D. Va. Nov. 7, 2008), where the class size was so small that counsel's fee ended up being $8,300.00, well below the actual time counsel had invested in the case. Indeed, in *Conley v. First Tennessee*, 1:10cv1247 (E.D.Va.), counsel took the same consistent position with respect to a class of 350 consumer and resulted in recovery of an approved fee of only $20,000.00. (Docket No. 37).

These matters, and others that resulted in dismissal or no class outcome, are the necessary context for this petition for what in raw dollars is a very large fee.  In this litigation as in all class cases, Virginia counsel (and likely co-counsel as well0 tie their fate to that of the class.  The fee is large in this case for only one reason – the cash recovery for the class is large.  Not the potential recovery, or the non-monetary or the abstract value.  The cash that must leave the Defendants (it already has – it was paid into an escrow mutually controlled by the Parties' counsel) for the benefit of the class.  This symmetry of incentives between counsel and the class motivates Class Counsel to maximize class cash benefit to the largest degree possible.  If a common fund fee is capped at a dollar value instead of a market percentage, there would still be an incentive to take such cases, but there would then be a disincentive to stay the course and litigate through an otherwise low common fund amount.  It must work both ways.  As Judge Young pointedly suggested:

> Simply put, the class action vehicle is broken. While it may not
> instantaneously or completely resolve the problems that currently inhere in
> this type of litigation, tying the award of attorneys' fees to claims made by
> class members is one step that judges can take toward repair. This

approach will not only encourage more realistic settlement negotiations and agreements, but also will drive class counsel to devise ways to improve how class action suits and settlements operate. *See* Deborah R. Hensler and Thomas D. Rowe, Jr., *Beyond "It Just Ain't Worth It":* *Alternative Strategies for Damage Class Action Reform,* 64 Law & Contemp. Probs. 137, 150 (2001) (" 'The single most important action that judges can take to support the public goals of class action litigation is to reward class action attorneys only for lawsuits that actually accomplish something of value to class members and society.' **To this end, ... analysts recommend[ ] that judges award fees based on the actual amounts paid out by defendants to class members, notwithstanding contrary case law." (quoting Deborah Hensler et al., Rand, Class Action Dilemmas: Pursuing Public Goals for Private Gain-Executive Summary 33 (1999))). Class counsel will have an incentive to pay attention to the needs and desires of the class and to "think outside the box" to devise better notice programs, settlement terms, and claim procedures, all to the benefit of the consumers who have been harmed.**

*In re TJX Companies Retail Sec. Breach Litig.*, 584 F. Supp. 2d 395, 406 (D. Mass. 2008)

(Emphasis added).

In this case, Class Counsel shouldered the entire risk of the litigation, spending significant time to investigate the cases prior to filing, responding to dispositive and non-dispositive motions, conducting the back and forth of discovery, vigorously litigating, and finally negotiating over the better part of a year to reach this conclusion. Doing so required the litigation of three federal cases, within three jurisdictions, using six private law firms and working with a public interest legal service organization. While the fee will be substantial – certainly so – it is well deserved and earned. The risks taken will be compensated. But there was certainly substantial investment and risk incurred. Class Counsel requests a fee based on their earned percentage of the cash fund obtained. Yet

there is no doubt that the excellent outcome in this case for the Class was the result of risk-taking and really hard work by a ton of necessarily skilled lawyers.[18]

In this case, and in all cases in which Plaintiffs' counsel will come before this Court, they submit that the proper measure of compensation should be driven by the benefit actually obtained for the class members. Because Class Counsel's requested fee of 33% is reasonable under the circumstances of this case and the applicable law, the Court should award it.

## IV.    CONCLUSION

In summary, the Parties have reached a settlement in this case that provides genuine relief to the class members. The settlement is an excellent result considering the contentiousness and status of the litigation, the outcome actively mediated by Professor Green and the amount of money that will be paid to each class member. Each class member received the benefit of the settlement, regardless of whether they were aware that the Defendants' conduct violated the FCRA and even whether they suffered actual harm. In addition, the terms of the Settlement as well as the circumstances surrounding negotiations and its elimination of further costs caused by litigation this case through trial and appeal satisfy the Fourth Circuit's strictures for final approval. The Plaintiffs respectfully move that the Court grant their motion for final approval of this settlement and award the incentive payment and attorneys fees and costs as requested herein.

---

[18] Class Counsel has included various partial summaries of work performed.  (See Bennett Declaration, Exhibit "A").  They have not attempted to compile all of their time and expenses , nor have they attempted to edit their summaries for billing discretion, replication or record-keeping errors.  They have each litigated the case as a contingency fee matter.  The records are offered for the single purpose of evidencing the length and complexity of the litigation.

JAMES RYALS, JR., et als.,


_____/s/_____
Leonard A. Bennett VSB #37523
Matthew J. Erausquin
CONSUMER LITIGATION
ASSOCIATES, P.C.
12515 Warwick Boulevard, Suite 100
Newport News, Virginia 23606
(757) 930-3660 – Telephone
(757) 930-3662 – Facsimile
lenbennett@clalegal.com

Matthew J. Erausquin
CONSUMER LITIGATION
ASSOCIATES, P.C.
1800 Diagonal Rd. Suite 600
Alexandria, Virginia 22314
(703) 273-6080
(888)-892-3512
matt@clalegal.com

Christopher Colt North
751-A Thimble Shoals Blvd.
Newport News, VA 23606
(757) 873-1010
cnorthlaw@aol.com

Michael D. Donovan, Esq.
Noah Axler, Esq.
DONOVAN SEARLES & AXLER, LLC
1845 Walnut Street, Suite 1100
Philadelphia, PA  19103
(215) 732-6067 – Telephone
(215) 732-8060 – Facsimile
mdonovan@donovanaxler.com
naxler@donovanaxler.com

Dennis Michael O'Toole
Anthony Rocco Pecora
Matthew Anderson Dooley
STUMPHAUZER, O'TOOLE, MCLAUGHLIN,
MCGLAMERY & LOUGHMAN

5455 Detroit Rd.
Sheffield Village, Ohio 44054
(44) 930-4015
dotoole@sheffieldlaw.com
mdooley@sheffieldlaw.com
apecora@sheffieldlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of October, 2011, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send notification of such filing (NEF) to the following:

Amy Rachel Davis
Williams & Connolly LLP
725 12th St NW
Washington, DC 20005
202-434-5000
Fax: 202-434-5029
Email: adavis@wc.com

Dane Hal Butswinkas
Williams & Connolly LLP
725 12th St NW
Washington, DC 20005
(202) 434-5000

Daniel Patrick Shanahan
Williams & Connolly LLP
725 12th St NW
Washington, DC 20005
 (202) 434-5174
Fax: (202) 434-5029
Email: dshanahan@wc.com

Frank G Bowman
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, DC 20005
202-434-5000
Fax: 202-434-5029
Email: fbowman@wc.com

_____/s/_____
Leonard A. Bennett, Esq.
VSB #37523
Attorney for Plaintiff
CONSUMER LITIGATION
ASSOCIATES, P.C.
12515 Warwick Boulevard, Suite 100
Newport News, Virginia 23606
(757) 930-3660 – Telephone
(757) 930-3662 – Facsimile
lenbennett@clalegal.com